UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SATISH CHUTTOO | § | |
| | § | |
| v. | § | CIVIL NO. 4:20-CV-211-SDJ |
| | § | |
| STEFAN HORTON, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

In this 42 U.S.C. § 1983 action, Satish Chuttoo alleges that two Frisco, Texas police officers, Stefan Horton and Eliu Andrade, violated the Fourth Amendment by using excessive force against him during a traffic stop and unlawfully arrested him in retaliation for exercising his First Amendment rights.[1] Chuttoo also claims that the City of Frisco is liable for the alleged constitutional violations because of its failure to properly train its officers. Before the Court are the officers' and the City's respective motions for judgment on the pleadings. (Dkt. #21, #22). The officers invoke the defense of qualified immunity, and the City argues that Chuttoo fails to plausibly allege the required elements of a Section 1983-based municipal liability claim. Both motions are fully briefed. And, for the following reasons, both motions are **GRANTED**.

### I. BACKGROUND

On March 14, 2018, Chuttoo was driving in Frisco, Texas, when he passed the Frisco Police Department headquarters. At the same time, Officers Horton and

---

[1] Chuttoo also brought a state-law claim for assault and battery. In response to Defendants' motions for judgment on the pleadings, however, Chuttoo confirmed that he does not contest the dismissal of this claim. (Dkt. #28 at 18). Accordingly, the Court will dismiss Chuttoo's state-law claim for assault and battery.

Andrade pulled out of the parking lot of the police department and started heading in the same direction as Chuttoo. Because Chuttoo "was instinctively distrusting of the police in general," he "became suspicious." (Dkt. #1 ¶ 10–11).

While the officers were near him, Chuttoo held his phone up through the sunroof of his car. At some point, the officers initiated a traffic stop, and Chuttoo pulled into the parking lot of the India Bazaar grocery store. Horton approached Chuttoo first and said, "Hello. How's it going. Officer Horton, Frisco Police. The reason you are being stopped today is that you can't use your cell phone while you're driving. You can't be recording and all kinds of stuff like that." (Dkt. #17-2 at 0:41–49). In response, Chuttoo asked, "What about if officers are like stalking? What about that? Is that allowed?" (Dkt. #17-2 at 0:49–55). Andrade then asked Chuttoo for his driver's license and insurance. Chuttoo said, "I will give you license," and then asked again if stalking was allowed. (Dkt. #17-2 at 0:57–1:00). Andrade then asked Chuttoo if someone was stalking him, to which Chuttoo responded, "Yeah." (Dkt. #17-2 at 1:00–1:02).

Horton tried to defuse the situation and casually said, "We're just driving, man. This is where we patrol." (Dkt. #17-2 at 1:01–06). Chuttoo then interjected that he is a doctor but "wanted to be a cop" and that his dad "was a cop for 35 years." (Dkt. #17-2 at 1:06–14). Andrade, apparently trying to alleviate Chuttoo's stalking concerns, told Chuttoo that he did not know who he was or whether he was a doctor. Following suit, Horton added, "I don't know who you are. Are you a doctor? I have no idea who you are." (Dkt. #17-2 at 1:12–19). This seemed to upset Chuttoo, who told the officers,

"I will contact the Consulate right away tomorrow, I'm not going to leave you guys. I know what you're up to and what you are doing and it's not appreciated by me." (Dkt. #17-2 at 1:20–30). Chuttoo then handed his driver's license to Andrade.

At this point, things escalated. Horton started to ask Chuttoo a question: "What's going on, man, why are you so . . ." (Dkt. #17-2 at 1:30–39). Before Horton could finish his question, Chuttoo removed his seatbelt, leaned out the window, pointed his finger in the air, and loudly proclaimed, "I will go and talk to Consulate tomorrow! This policy is not appreciated by me!" (Dkt. #17-2 at 1:31–39). Chuttoo then abruptly reached toward the glove compartment of his car. (Dkt. #17-2 at 1:39). Andrade unholstered his weapon and aimed it at Chuttoo, while Horton unholstered his weapon but did not aim it at Chuttoo. (Dkt. #17-3 at 1:40–43); (Dkt. #17-1 at 2:25–33). Andrade instructed Chuttoo to show his hands and to not reach for anything. Chuttoo responded, "I am getting license," and put his hands in front of him. (Dkt. #17-2 at 1:45–49).

Andrade then opened the car door and grabbed Chuttoo's left hand, simultaneously commanding him to "[g]et out of the car." (Dkt. #17-2 at 1:46–50). Chuttoo did not immediately comply. Andrade again commanded Chuttoo to "get out of the car" and warned him twice, "You're about to get tased." (Dkt. #17-2 at 1:50–53). Both officers had holstered their weapons at this point. Chuttoo said, "You asked me to get license." (Dkt. #17-2 at 1:54–55). Chuttoo then exited his vehicle, and Horton grabbed Chuttoo's right hand. A few seconds later, Chuttoo began screaming

3

and running forward while the officers held onto him. (Dkt. #17-2 at 2:00–2:07).[2] A physical struggle ensued, during which Chuttoo repeatedly screamed, "help me," and the officers wrestled Chuttoo to the ground.

Chuttoo continued struggling while the officers tried to keep him on the ground. Andrade told Chuttoo to stop resisting and to relax and warned him that he was about to be tased. (Dkt. #17-2 at 2:08–14). The officers continually told Chuttoo to get on the ground. Chuttoo responded, "Okay, okay," yelled, "Help me," and then said, "I'm stopping" before forcing his way back onto his feet. (Dkt. #17-2 at 2:12–27). Andrade warned Chuttoo that he would be tased if he did not get back on the ground, and the officers got Chuttoo back on the ground. (Dkt. #17-2 at 2:30–37).

Andrade yelled, "What's wrong with you, man," and commanded Chuttoo to "lay flat" and "relax." (Dkt. #17-2 at 2:46–55). Chuttoo still did not place his hands behind his back and complained of his of arthritis. (Dkt. #17-2 at 2:51–54). The officers pulled Chuttoo part way up, so that he remained on his knees but his hands were off the ground, tried to handcuff him, and commanded him to give them his hands. (Dkt. #17-2 at 2:55–3:13). After Chuttoo failed to comply, the officers pushed his face into the ground. (Dkt. #17-2 at 3:17–19). Chuttoo then pushed his body off

---

[2] In his complaint, Chuttoo does not allege that the officers tased him right after exiting the vehicle. But in his response to Defendants' motions, he hints at this as a possibility. Horton and Andrade assert that they did not tase him until minutes later once they had Chuttoo on the ground. Chuttoo responds that "it is not at all clear" from the videos whether Chuttoo was tased earlier as well. (Dkt. #28 at 9). This halfhearted rebuttal does not align with Chuttoo's complaint, which alleges only that Chuttoo was tased twice on the ground, and it is blatantly contradicted by the video evidence, which shows that both officers had their hands on Chuttoo when he began screaming—not that either officer had his taser out.

the ground, and Andrade tased him, with the taser in "drive-stun" mode.[3] (Dkt. #17-2 at 3:27–28). Andrade told Chuttoo to put his hands behind his back or he would be tased again, to which Chuttoo responded, "okay, okay." (Dkt. #17-2 at 3:30–35). A second or two later, Andrade tased Chuttoo a second time, again in drive-stun mode. (Dkt. #17-2 at 3:35–37). At this point, Chuttoo relented and put his hands behind his back. The officers handcuffed Chuttoo and then requested medical assistance. (Dkt. #17-2 at 3:40–48, 5:33–35).

The officers arrested Chuttoo for resisting arrest and interference with public duties.  Following the arrest, Chuttoo was charged with the misdemeanor offense of resisting arrest. The prosecutor ultimately dropped the charges against him.

Chuttoo subsequently filed this lawsuit against Horton, Andrade, and the City. He brings individual- and official-capacity claims under 42 U.S.C. § 1983 against Horton and Andrade, alleging that they used excessive force against him in violation of the Fourth Amendment and unlawfully arrested him for exercising his First Amendment rights. Based on these alleged constitutional violations, Chuttoo also brings a Section 1983 claim for municipal liability against the City.

The officers and the City now separately move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Dkt. #21, #22). Based on the video evidence depicting the encounter, the officers argue that they are entitled to qualified

---

[3] "When taser prongs are deployed, they conduct an electric current that can immobilize a person by causing his muscles to seize up." *Cloud v. Stone*, 993 F.3d 379, 382 n.2 (5th Cir. 2021). A taser in drive-stun mode, "in which the taser leads make direct contact with the arrestee's body," *Pratt v. Harris County*, 822 F.3d 174, 178 (5th Cir. 2016), "inflicts a painful electric shock on contact" but "does not cause the same seizing effect," *Cloud*, 993 F.3d at 382 n.2.

immunity on Chuttoo's constitutional claims. The City likewise says it is entitled to judgment in its favor because, in its view, Chuttoo has failed to plausibly allege the required elements to state a Section 1983-based municipal liability claim.

## II. LEGAL STANDARDS

### A. Standard for Rule 12(c) Motions

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam). "The standard for Rule 12(c) motions for judgment on the pleadings is identical to the standard for Rule 12(b)(6) motions to dismiss for failure to state a claim." *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Determining whether a claim is plausible is a two-step inquiry. First, a court "must identify the complaint's well-pleaded factual content," which is entitled to a presumption of truth, and set aside "any unsupported legal conclusions," which are not entitled to the same presumption. *Id.* (quoting *Doe v. Robertson*, 751 F.3d 383, 388 (5th Cir. 2014)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (holding that while a plaintiff's allegations need not be detailed, they must include more than mere "labels and conclusions" or "a formulaic

recitation of the elements"). Second, after removing all unsupported legal conclusions, the court must ask whether "the remaining allegations are sufficient to nudge the plaintiff's claim across the plausibility threshold." *Waller*, 922 F.3d at 599 (cleaned up). This threshold is surpassed when the court, drawing on its common sense and judicial experience, "can reasonably infer from the complaint's well-pleaded factual content 'more than the mere possibility of misconduct.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## B. Conversion to Summary Judgment

When a motion for judgment on the pleadings refers to matters outside the complaint and the district court considers those matters, the court generally must treat the motion as one for summary judgment under Rule 56. FED. R. CIV. P. 12(d). But as with most general rules, this one has a couple of exceptions. First, courts may consider matters of which they can take judicial notice. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996); *see also* FED. R. EVID. 201(d) ("The court may take judicial notice at any stage of the proceeding.").[4] Second, courts may consider documents attached to a Rule 12(c) motion "that [1] are referred to in the plaintiff's complaint and [2] are central to the plaintiff's claim." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

The "Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims," but "the case law suggests that documents are

_____

[4] "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).

central when they are necessary to establish an element of one of the plaintiff's claims." *Crucci v. Seterus, Inc.*, No. EP–13–CV–317, 2013 WL 6146040, at *4 (W.D. Tex. Nov. 21, 2013) (citation omitted). As a common example, "when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Id.* By contrast, "if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.*

In this case, the City's motion refers only to the pleadings and matters of which the Court arguably could take judicial notice, such as the fact that the officers were certified according to state-mandated police training standards.[5] But for reasons explained later, *see infra* Part III(B), the Court need not and will not consider any material beyond the pleadings to decide the City's motion.[6] *See Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (explaining that a district court has "complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12[(c)] motion" (quotation omitted)). Thus, for purposes of resolving the City's Rule 12(c)

---

[5] The City's motion states that it "incorporates and adopts" the recitation of facts in Horton and Andrade's motion, (Dkt. #22 at 3 n.8), which, as noted below, relies on evidence outside the complaint. But the Court finds that the City's motion does not rely on any such extrinsic evidence. Thus, the Court will treat the City's motion as one for judgment on the pleadings under Rule 12(c).

[6] Because Rule 12(d) applies to both Rule 12(b)(6) and Rule 12(c) motions, FED. R. CIV. P. 12(d), and because the "standard for Rule 12(c) motions . . . is identical to the standard for Rule 12(b)(6) motions," *Waller*, 922 F.3d at 599, case law addressing the latter type of motion is instructive here.

motion, the Court has excluded from consideration all matters outside Chuttoo's complaint.

Horton and Andrade, however, incorporate into their motion twelve exhibits attached to their answer. The officers assert that these exhibits "constitute either public records and/or complete copies of exhibits which address allegations and documents directly and/or indirectly referenced in [Chuttoo's] Complaint." (Dkt. #21 at 3). They also argue that all of these exhibits are central to Chuttoo's claims and that the Court may take judicial notice of each. Looking to Chuttoo's complaint, the Court is not persuaded.

Chuttoo directly references one of the exhibits, the transcript of the suppression hearing, in his complaint. And while it is true that Chuttoo quotes and relies on the state-court judge's opinions at that hearing to support his excessive-force claim, that transcript is not *necessary* to establish any element of his claims. The transcript is therefore not "central" to Chuttoo's claims in this case. Aside from the suppression-hearing transcript, Chuttoo does not incorporate by reference any of Horton and Andrade's remaining exhibits, such as the squad-car or bodycam videos on which Horton and Andrade's motion heavily relies.

On the one hand, the Court could take judicial notice of some facts in the exhibits, such as the fact that both Horton and Andrade have completed all officer training required by the State of Texas (Exhibits 11 and 12). The Court could also take judicial notice of the *existence* of some documents comprising the exhibits—such

as the incident reports, citation, and suppression-hearing testimony (Exhibits 4–7, 9).

On the other hand, the Court cannot take judicial notice of any of the facts in other exhibits, such as the squad-car and bodycam videos, because they are not the sort of facts that are "generally known within the trial court's territorial jurisdiction" or that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Because Horton and Andrade's Rule 12(c) motion relies on all of these exhibits—none of which are incorporated into Chuttoo's complaint, and most of which cannot be judicially noticed—the Court concludes that Horton and Andrade's motion should be converted into a motion for summary judgment.

Before a district court may convert a motion for judgment on the pleadings into one for summary judgment, it must provide adequate notice to the parties. FED. R. CIV. P. 12(d); *Estate of Smith v. Tarrant Cnty. Hosp. Dist.*, 691 F.2d 207, 208 (5th Cir. 1982). This does not, however, require the court to give "express notice" that it intends to treat a motion for judgment on the pleadings as a motion for summary judgment. *See Snider v. L-3 Commc'ns Vertex Aerospace, L.L.C.*, 946 F.3d 660, 667 (5th Cir. 2019); *see also Guiles v. Tarrant Cnty. Bail Bond Bd.*, 456 F.App'x 485, 487 (5th Cir. 2012) (per curiam) ("The court need not expressly warn the nonmovant that it plans to convert the motion."). Rather, "the notice required is only that the district court *could* treat the motion as one for summary judgment, not that the court *would* in fact do so." *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1284 (5th Cir. 1990). "A non-

moving party receives adequate notice when it is aware that the movant has placed matters outside the pleadings before the district court for its review." *Guiles*, 456 F.App'x at 487; *see also Mackey v. Owens*, 182 F.3d 915, 1999 WL 423077, at *2 (5th Cir. June 2, 1999) (unpublished table decision) (per curiam) ("[T]he simple act of placing matters outside the pleadings before the court provides adequate notice that a motion to dismiss may be converted into a motion for summary judgment.").

Here, the parties had adequate notice that the Court could treat Horton and Andrade's motion for judgment on the pleadings as a motion for summary judgment. As discussed above, the officers presented matters outside the pleadings—including the dashcam and bodycam videos both sides rely on—in support of their motion. Chuttoo not only raised evidentiary objections to some of these matters but also agreed that "[t]he videos control" and asserted that the Court should apply the summary-judgment standard for reviewing such evidence. (Dkt. #36 at 1–2 (citing *Morris v. Leblanc*, 674 F.App'x 374, 378 n.6 (5th Cir. 2016) (per curiam), and *Scott v. Harris,* 550 U.S. 372, 379–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007))). Thus, the parties had adequate notice that the Court might convert the officers' motion into one for summary judgment.

## C. Standard for Summary-Judgment Motions Based on Qualified Immunity

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Shepherd ex rel. Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). Because Rule 56 requires that there be no "*genuine* issue of *material* fact" to succeed on a motion for summary

judgment, "the mere existence of *some* alleged factual dispute" cannot defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam).

A "good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (quotation omitted). To avoid summary judgment, the plaintiff "must point out a genuine dispute of material fact as to whether [the defendant's] allegedly wrongful conduct violated clearly established law." *Id.* (quotation omitted). The court still draws "all inferences in the plaintiff's favor." *Id.* (quotation omitted).

In this case, the encounter was captured on Horton's and Andrade's bodycams and the squad-car dashcam. Those videos, when viewed together, "clearly show[] every particular element of the altercation, and no party contests [their] accuracy or completeness." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (cleaned up); *see also* (Dkt. #36 at 1 (asserting that "[t]he videos control" and agreeing that "[r]hetoric by counsel will not change what is clearly shown by the videos")); (Dkt. #33 at 3 ("Body Camera Videos . . . control[.]")). Thus, while viewing the evidence favorably to Chuttoo, the Court assigns "greater weight, even at the summary judgment stage, to

12

the . . . video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); *see also Scott,* 550 U.S. at 381 (explaining that a court deciding a motion for summary judgment based on qualified immunity need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider "the facts in the light depicted by the videotape").

## III. DISCUSSION

The Court first considers Horton and Andrade's converted motion for summary judgment and then determines whether Chuttoo has stated a plausible claim for relief against the City.

### A. Horton and Andrade's Converted Summary-Judgment Motion

Before examining the merits of Horton and Andrade's assertion of qualified immunity, the Court must address Chuttoo's objections to evidence they presented in support of their motion.

#### i. Evidentiary Objections

Chuttoo objects to several exhibits attached to Horton and Andrade's answer. Chuttoo objects that Exhibits 4 through 9, or at least the portions that the officers rely on, are hearsay. In addition, Chuttoo objects to Exhibits 11 and 12 as improper character evidence.

##### a. Hearsay Objections

Hearsay is any statement that "the declarant does not make while testifying at the current trial or hearing" that "a party offers in evidence to prove the truth of

the matter asserted in the statement." FED. R. EVID. 801(c).[7]

Chuttoo asserts that the following exhibits constitute hearsay: the incident report (Exhibit 4), the response to resistance report (Exhibit 5), the citation report (Exhibit 6), the citation (Exhibit 7), the information charging Chuttoo with resisting arrest (Exhibit 8), and the transcript of the state-court suppression hearing (Exhibit 9). Horton and Andrade contend that the Court should admit all these exhibits because they are central to Chuttoo's claims, because they are attached to the officers' answer, and because Chuttoo references and quotes from these exhibits in his filings. Even if the Court had not already rejected the first contention, none of these points obviate the Rules' prohibition on hearsay. Thus, the Court will analyze Chuttoo's hearsay objections for each piece of evidence.

As to Exhibits 4 through 8—the reports, the citation, and the charging instrument—the Court finds that it may take judicial notice of the existence of those documents. Thus, they are admitted to the extent they show that the officers wrote the reports and the citation and that Chuttoo was charged with resisting arrest. Yet the Court cannot take judicial notice of the *contents* of those documents—that is, the truth of the statements asserted. Those statements were made by Horton, Andrade, or prosecutors outside of court. They are classic hearsay statements, and Defendants have offered no valid exception. Thus, the Court **SUSTAINS** Chuttoo's objection to

---

[7] While Rule 801 says, "trial or hearing," the same standards that govern admissibility of evidence at trial apply where, as here, the evidence is offered in summary-judgment briefing. *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 650 n.3 (5th Cir. 1992); *Adaway v. City of Jasper*, No. 1:16-CV-117, 2017 WL 5641535, at *3 (E.D. Tex. Apr. 28, 2017).

Exhibits 4 through 8; the statements in those exhibits may not be admitted for the truth of the matter asserted.

As to Exhibit 9, Chuttoo is correct that the testimonies found in the suppression-hearing transcript also constitute out-of-court statements that Horton and Andrade seek to admit for the truth of the matter asserted. But in response, Horton and Andrade contend that the Court should consider the entire transcript under the rule of optional completeness because Chuttoo relies on portions of the transcript himself. Federal Rule of Evidence 106 states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time."

In his complaint, Chuttoo relies on statements made at the suppression hearing to support two points: (1) at the hearing, the state-court judge found "that none of the alleged traffic infractions were captured on the police video of the encounter," (Dkt. #1 at 5 n.1); and (2) the same judge found that the officers' force was unnecessary and "disturbing," (Dkt. #1 ¶ 16). In his response to the officers' motion, Chuttoo relies on the transcript of the hearing for two more points: (1) the prosecutor's admission that the Texas Transportation Code does not expressly forbid filming while driving, (Dkt. #28 at 5–6); and (2) the state-court judge's (seemingly mistaken) belief that he heard a "sparking noise" in the video when Chuttoo exited the vehicle, (Dkt. #28 at 9).

The officers seek to admit the transcript to rebut Chuttoo's points, hoping to

introduce other portions of the transcript to place Chuttoo's cited portions in context. Yet, despite relying on the transcript himself, Chuttoo has objected that the statements made at the suppression hearing are hearsay. Horton and Andrade reply that Chuttoo should not be permitted to cherry-pick certain statements from that hearing while objecting to others.

Horton and Andrade are correct about the problem but not about the solution. Chuttoo has correctly pointed out that the statements made at the suppression hearing are hearsay, and Horton and Andrade have not identified an exception under the Rules that would allow those statements to be admitted. The rule of optional completeness is not an exception to the rule against hearsay. Because of Chuttoo's objection, the statements from the suppression hearing on which Horton and Andrade rely must be excluded as summary-judgment evidence.

But that means that Chuttoo cannot rely on statements from that hearing either. Chuttoo's complaint quotes certain portions of the hearing, and the Court will not strike those statements as *allegations*. But the Court will not permit Chuttoo to introduce any portion of the suppression hearing as *evidence* to prove those allegations, rendering the statements (what the state-court judge and prosecutor said about the incident) mere allegations. Thus, the Court **SUSTAINS** Chuttoo's objection to Horton and Andrade's Exhibit 9; no portion of that transcript may be admitted as evidence by any party.

### b. Character Evidence

Chuttoo objects to two more of Horton and Andrade's exhibits: the Texas Commission on Law Enforcement (TCOLE) Status Reports for both officers

(Exhibits 11 and 12). For both, Chuttoo objects that they constitute improper character evidence because the officers' "training history has no tendency to prove or disprove their character for truthfulness." (Dkt. #28 at 3). But the officers do not appear to seek admission of these exhibits to prove their character. Defendants cite these exhibits only two times and only for one purpose. First, in paragraph 29 of their answer, Defendants assert that the officers were trained according to TCOLE's standards. (Dkt. #17 ¶ 29). Second, in the City's motion, the City asserts that, because TCOLE certified Horton according to state-mandated training standards, his certification per se invalidates Chuttoo's failure-to-train claim against the City. (Dkt. #22 at 10). Both references to these exhibits concern the TCOLE certifications' legal effect on Chuttoo's failure-to-train claim—not the officers' character. Thus, Chuttoo's objections to Exhibits 11 and 12 are **OVERRULED**.

### ii. Qualified Immunity

Horton and Andrade raise the defense of qualified immunity against Chuttoo's individual-capacity claims for excessive force and retaliatory arrest.[8] Qualified immunity is a court-created doctrine that limits when state officials may be sued in

---

[8] Chuttoo also brings claims against Horton and Andrade in their official capacity. But as the officers point out, and Chuttoo does not contest, these claims are duplicative of the claims against the City. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (explaining that a suit against an official in his official capacity "is not a suit against the official but rather is a suit against the official's office" and, therefore, "is no different from a suit against the [entity] itself"). Accordingly, the Court will dismiss Chuttoo's official-capacity claims against Horton and Andrade as duplicative of his claims against the City. *Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020) (holding that the district court properly dismissed official-capacity claim as duplicative of the municipal-liability claim); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (affirming district court's dismissal of Section 1983 plaintiff's claims against government officials in their official capacities because such claims were duplicative of those against the municipality).

their individual capacities for alleged constitutional violations. A plaintiff seeking to defeat qualified immunity must show (1) that the official violated a statutory or constitutional right and (2) that the asserted right was "clearly established" at the time of the challenged conduct. *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021). A court has discretion to address either or both prongs. *Id.* In doing so, the court must "assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison." *Pratt v. Harris County*, 822 F.3d 174, 181 (5th Cir. 2016).

Here, Horton and Andrade argue that their use of force against Chuttoo was neither excessive under the Fourth Amendment nor forbidden by clearly established law. They also argue that they are entitled to qualified immunity on Chuttoo's First Amendment retaliation claim because they did not violate any clearly established right when they pulled him over and arrested him. The Court addresses these arguments in turn.

### a. Excessive Force

As to the Fourth Amendment claim, Chuttoo alleges that Horton and Andrade used excessive force against him by aiming their guns at him, physically pulling him from his vehicle, throwing him to the ground, tasing him twice, and ultimately arresting him. Horton and Andrade contend that this claim fails on both prongs of qualified immunity. The Court agrees.

### 1. Constitutional Violation

Prong one asks whether Horton's or Andrade's use of force violated the Fourth Amendment. An officer violates the Fourth Amendment when an arrestee "suffers an injury that results directly and only from a clearly excessive and objectively

unreasonable use of force." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020); *see also Graham v. Connor*, 490 U.S. 386, 395–96, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This is a necessarily fact-intensive inquiry. *Pratt*, 822 F.3d at 181. It is also an objective one: "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Graham*, 490 U.S. at 397). Courts must evaluate an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Here, the parties dispute only whether Horton's and Andrade's respective uses of force were clearly excessive and objectively unreasonable. These questions "are often intertwined." *Poole*, 691 F.3d at 628. Factors that guide the analysis include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). Courts also consider "the relationship between the need for force and the amount of force used." *Betts*, 22 F.4th at 582 (cleaned up). When facing "an uncooperative arrestee, officers properly use measured and ascending actions that correspond to the arrestee's escalating verbal and physical resistance." *Cloud*, 993 F.3d at 384 (cleaned up).

Horton's and Andrade's respective uses of force are best sorted into four stages: (1) Chuttoo reaches for his glove compartment, Andrade reacts by aiming his weapon

at Chuttoo, Horton reacts by unholstering his gun, and the officers pull Chuttoo from the vehicle; (2) Chuttoo resists the officers' attempts to detain him, and the officers tackle him to the ground, push his face into the ground, and attempt to handcuff him; (3) Andrade tases Chuttoo a first time; and (4) the physical struggle continues, Chuttoo says, "ok, ok," and Andrade tases Chuttoo again.

During the first stage, after an escalation of agitated behavior, including leaning out the window and yelling at the officers that their "policy is not appreciated," Chuttoo quickly reached for his glove compartment. Chuttoo contends that he was merely reaching for his insurance. But a reasonable officer in Horton's and Andrade's situation—faced with an angry driver who adopted a confrontational stance at the outset, said he believed officers were stalking him, and just yelled at them—would have considered a quick movement toward the glove compartment to be potentially dangerous. *Maryland v. Wilson*, 519 U.S. 408, 413, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (observing that "traffic stops may be dangerous encounters" and that in "1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops" (citation omitted)); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (holding that given "legitimate concerns for the officer's safety," during a lawful stop "officers may order the driver to get out of the vehicle without violating the Fourth Amendment[]"). Under these circumstances, Horton and Andrade "reasonably wanted to get [Chuttoo] away from the driver's compartment where a weapon might easily be hidden." *See Betts*, 22 F.4th at 583. Thus, viewing the evidence in the light most favorable to Chuttoo, the officers'

actions in drawing their handguns, re-holstering them, and removing Chuttoo from his vehicle were not clearly excessive or unreasonable.

At the next stage of the encounter, the officers wrestled Chuttoo to the ground, pushed his face into the ground, and pulled his arms behind him in an attempt to handcuff him. Of the *Graham* factors, the extent of Chuttoo's resistance is the most important to analyzing these uses of force. The other two factors—the "severity of the crime at issue" and the "immediate threat to the safety of the officers or others"—are less illuminating. Chuttoo was suspected of only a minor offense, at least before he started to resist arrest, so this factor weighs in his favor. On the other hand, Chuttoo's agitated, confrontational manner and physical resistance created some threat to the officers' safety. The salient consideration here, then—and the parties' chief dispute— is the degree of Chuttoo's resistance.

Chuttoo asserts that he obeyed all the officers' commands and was not actively resisting them after he exited his vehicle. This assertion is blatantly contradicted by the bodycam videos. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). While Chuttoo, at first, calmly exited the vehicle, only a few seconds later he began screaming and running forward while the officers held onto him. (Dkt. #17-2 at 2:00–2:07).

A physical struggle ensued between Chuttoo and the officers, during which Andrade told Chuttoo to "relax" and repeatedly instructed him to "stop resisting."

(Dkt. #17-2 at 2:08–2:14). Yet Chuttoo continued to physically resist the officers while repeatedly screaming "help me." (Dkt. #17-2 at 2:06–2:14). Although Chuttoo says that he was not physically resisting—contrary to what the videos clearly show—or attempting to flee, a reasonable officer in this situation would *perceive* that Chuttoo was doing just that. Given Chuttoo's failure to comply with multiple commands and his active resistance, the officers' use of physical force in an attempt to restrain Chuttoo was objectionably reasonable. *See Collier v. Montgomery*, 569 F.3d 214, 216, 219 (5th Cir. 2009) (holding that an officer reasonably pushed an arrestee onto the hood of a police cruiser, causing some bruises and chest pain, after the arrestee physically resisted by "pull[ing] his hand back and turn[ing] away from the officer" and grappling with him briefly).

The next question is whether Andrade's first tasing of Chuttoo was objectively reasonable and not clearly excessive. When, like here, "the severity of crime and immediate safety threat are relatively inconclusive, a suspect's active resistance to arrest may justify this degree of force." *Cloud*, 993 F.3d at 384. The Fifth Circuit has "found tasing not excessive where a suspect resists arrest or fails to follow police orders or resists an officer's attempt to handcuff him." *Betts*, 22 F.4th at 583 (cleaned up); *see also Buchanan v. Gulfport Police Dep't*, 530 F.App'x 307, 314 (5th Cir. 2013) (per curiam) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him."). In *Pratt*, for example, two officers reasonably tased an arrestee because he had "aggressively evaded [their] attempts to apprehend him" and because they did so

after the arrestee "continuously failed to comply," other "efforts to subdue [him] were ineffective," and the arrestee had "continued to resist handcuffing." 822 F.3d at 182. Likewise, in *Poole*, two officers were reasonable to use a taser when a suspect "immediate[ly] and persistent[ly]" resisted arrest and ignored an officer's verbal commands and the officer attempted to grab the suspect's arm "before resorting to the taser." 691 F.3d at 629.

By contrast, the Fifth Circuit has "found excessive force when officers tased someone offering only passive resistance or no resistance at all." *Cloud*, 993 F.3d at 385. The court recently held, for instance, that officers used excessive force when they repeatedly beat and tased someone who "was not suspected of committing any crime, was in the fetal position, and was not actively resisting." *Joseph*, 981 F.3d at 336. Similarly, the Fifth Circuit "found excessive force when an officer tased someone who did no more than pull his arm out of the officer's grasp, and who was not even suspected of a crime up to that point." *Cloud*, 993 F.3d at 385 (citing *Ramirez v. Martinez*, 716 F.3d 369, 372, 378 (5th Cir. 2013), and *Trammell v. Fruge*, 868 F.3d 332, 341–42 (5th Cir. 2017)). And the Fifth Circuit has also said that "officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an 'off-color joke.'" *Id.* (quoting *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012)). In the last situation, the court reasoned that it was unreasonable for police to "immediately resort[] to taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Id.* at 763 (alteration in original).

Here, viewing the evidence in the light most favorable to him, Chuttoo's resistance was more than merely uncooperative or argumentative. Chuttoo did not just mouth off at Horton and Andrade, ignore one of their orders, or simply pull his arm away from their grasp. Rather, as the videos show, Chuttoo actively resisted the officers' attempts to detain him.[9] The officers repeatedly commanded Chuttoo to put his hands behind his back and lay flat. Chuttoo did not do so. Instead, Chuttoo pushed himself off the ground and stood up. Once back on the ground, Chuttoo continued to resist the officers and again attempted (this time unsuccessfully) to rise to his feet. Chuttoo's complaint about arthritis would indicate to a reasonable officer that it might be painful for Chuttoo to place his hands behind his back. But it would not explain why Chuttoo ignored multiple commands to lay flat and made more than one attempt to stand up. Chuttoo's conduct at this juncture compares unfavorably with passive-resistance cases in which the Fifth Circuit has deemed the use of a taser unreasonable. *Cf. Newman*, 703 F.3d at 762–63; *Ramirez*, 716 F.3d at 372, 378. After Chuttoo continuously disobeyed commands and prevented the officers from detaining him, Andrade had reasonable grounds to tase him.

Other factors show that Andrade's tasing of Chuttoo was reasonable. Critically, Andrade "did not tase as a first resort." *Betts*, 22 F.4th at 583. That is, he did not "immediately resort[]" to the taser "without attempting to use physical skill, negotiation, or even commands." *Newman*, 703 F.3d at 763; *see also Trammell*, 868

---

[9] In his response to the officers' motion, Chuttoo asserts that he was relenting to arrest at the time of this first tasing. (Dkt. #28 at 10). Once again, the videos of the encounter plainly refute this assertion, so the Court declines to adopt this version of the facts. *See Scott*, 550 U.S. at 380–81.

F.3d at 342 ("[T]he speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need."). To the contrary, Andrade (and Horton) first tried to gain Chuttoo's compliance through verbal commands and milder force. Only when those methods failed did Andrade use his taser. Thus, Andrade responded "with 'measured and ascending' actions that corresponded to [Chuttoo's] escalating verbal and physical resistance." *Pratt*, 822 F.3d at 182 (quoting *Poole*, 691 F.3d at 629).

The question remaining is whether, even if Andrade's initial tase was justified, his subsequent drive-stun maneuver was excessive.[10] To be sure, "the same incident can include both lawful and unlawful uses of force." *Cloud*, 993 F.3d at 386. It is also true that "[f]orce must be reduced once a suspect has been subdued." *Joseph*, 981 F.3d at 335. The circumstances justifying force, however, were still present when Andrade tased Chuttoo a second time. Chuttoo has not pointed to any evidence that he complied with any commands or had been subdued after the first tase. As the videos show, Chuttoo was not yet handcuffed or lying facedown on the ground. The only indication Chuttoo *might* have relented at this point is that he said, "ok, ok," in response to Andrade's verbal command to put his arms behind his back. But only a minute or so earlier, Chuttoo said the same thing right before he disobeyed the same command, pushed himself off the ground, and stood up. (Dkt. #17-2 at 2:12–27). So viewed from "the perspective of a reasonable officer on the scene, rather than with

---

[10] It bears noting, again, that Chuttoo does not discuss the officers' actions separately. Nor does Chuttoo argue that even if Andrade's initial tase was justified, his subsequent drive-stun maneuver was excessive. Instead, Chuttoo argues generally that Horton's and Andrade's combined actions were unreasonable.

the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, Andrade had good reason to doubt Chuttoo's compliance. Under these "tense, uncertain, and rapidly evolving" circumstances, Andrade's split-second decision to use his taser a second time, like his initial tase, was reasonable. *See Cloud*, 993 F.3d at 386–87 (quoting *Graham*, 490 U.S. at 397).

In sum, taking the facts depicted in the bodycam videos in the light most favorable to Chuttoo and drawing every reasonable inference in his favor, Horton's and Andrade's respective uses of force were not clearly excessive or unreasonable. The officers are therefore entitled to qualified immunity on Chuttoo's excessive-force claim.

### 2. Clearly Established Law

Even if a Fourth Amendment violation occurred, Horton and Andrade are still entitled to qualified immunity because their use of force did not violate any clearly established right.

"The clearly established inquiry is demanding, especially in claims for excessive force." *Harmon v. City of Arlington*, 16 F.4th 1159, 1167 (5th Cir. 2021). Such claims often involve officers making "split-second decisions," and the "results depend 'very much on the facts of each case.'" *Id.* at 1166 (quoting *Kisela v. Hughes*, 138 S.Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam)); *see also Plumhoff v. Rickard*, 572 U.S. 765, 775, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) (observing that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation" (quoting *Graham*, 490 U.S. at 396–97)). This means the

existing precedent must "squarely govern the specific facts at issue, such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did." *Joseph*, 981 F.3d at 337 (cleaned up).

When conducting this inquiry, courts must "frame the constitutional question with specificity and granularity," *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019), rather than "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). An officer loses qualified immunity only when "the violative nature of *particular* conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (per curiam) (quotations omitted). In other words, controlling precedent must have placed the constitutional question "beyond debate," with the right's contours "sufficiently definite that any reasonable official in the [officer's] shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 778–79, 134 S.Ct. 2012 (quoting *al-Kidd*, 563 U.S. at 741).

Here, Chuttoo has not acknowledged—let alone attempted to meet—his "burden to find a case in his favor that does not define the law at a high level of generality." *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam)); *see also Harmon*, 16 F.4th at 1167 (explaining that, in excessive force cases, "the plaintiff must point to a case almost squarely on point"). Chuttoo identifies no factually analogous precedent of the Supreme Court or the Fifth Circuit (or any other circuit) clearly establishing that any reasonable officer in Horton's or Andrade's shoes would have known their use of force

27

was unlawful. "That alone dooms his case here."[11] *Vann*, 884 F.3d at 310; *see also Trevino v. Hinz*, 751 F.App'x 551, 555 (5th Cir. 2018) (per curiam) (same). So Horton and Andrade are entitled to qualified immunity on this ground as well.

### b. Retaliatory Arrest

Chuttoo also claims that Horton and Andrade violated his First Amendment rights by arresting him in retaliation for filming them. The officers argue that they are entitled to qualified immunity on this claim. Again, the Court agrees.

To establish a claim for retaliatory arrest in violation of the First Amendment, a plaintiff must show (1) engagement in a constitutionally protected activity; (2) an injury caused by the defendant's actions that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse actions were substantially motivated by the plaintiff's exercise of constitutionally protected activity. *Cass v. City of Abilene*, 814 F.3d 721, 729 (5th Cir. 2016) (per curiam) (citing *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)). As the Supreme Court recently clarified, the presence of probable cause generally defeats a First Amendment retaliatory arrest claim.[12] *Nieves v. Bartlett*, 139 S.Ct. 1715, 1726, 204 L.Ed.2d 1 (2019).

---

[11] To be clear, Chuttoo does not argue that a "robust consensus of persuasive authority" exists "that defines the contours of the right in question with a high degree of particularity." *Rich*, 920 F.3d at 294 (quotation omitted). Nor does Chuttoo argue that this case involves an "obvious" constitutional violation, such that he "need not identify an on-point case to overcome qualified immunity." *Salazar v. Molina*, 37 F.4th 278, 285–86 (5th Cir. 2022) (quotation omitted).

[12] In *Nieves*, the Supreme Court created "a narrow qualification . . . for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 139 S.Ct. at 1727. The Supreme Court "conclude[d] that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was

Chuttoo correctly points out that "a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions." *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017). But the existence of that right does not relieve Chuttoo of his threshold burden to "plead and prove the absence of probable cause for the arrest," *Nieves*, 139 S.Ct. at 1724, even if the officers acted with retaliatory intent, *see id.* at 1725. It follows that Chuttoo cannot rebut the officers' qualified immunity defense without, first, showing they lacked probable cause to arrest him and, second, "establishing that the absence of probable cause would have been apparent to any reasonable officer in [their] position." *Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir. 2020).

Probable cause exists when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quotation omitted). The "probable cause analysis only requires that [a court] find a basis for an officer to believe to a fair probability that a violation occurred." *Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000) (per curiam) (quotation omitted).

Here, it is undisputed that Horton and Andrade arrested Chuttoo for (1) resisting arrest, in violation of Texas Penal Code Section 38.03(a); and

---

arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* Chuttoo presents no such evidence, and the Court concludes that *Nieves*'s "narrow qualification" is inapplicable here.

(2) interference with public duties, in violation of Texas Penal Code Section 38.15(a). It also undisputed that, following the encounter, Chuttoo was formally charged with resisting arrest. Under Texas law, a person resists arrest "if he intentionally prevents or obstructs a person he knows is a peace officer . . . from effecting an arrest, search, or transportation of the actor . . . by using force against the peace officer." TEX. PENAL CODE § 38.03(a). Notably, it "is no defense to prosecution . . . that the arrest or search was unlawful." *Id.* § 38.03(b).

In Chuttoo's view, Horton and Andrade lacked probable cause to arrest him for resisting arrest because "everything in the . . . videos shows that [he] was complying or was trying to comply with the Officers' commands." (Dkt. #28 at 14). But again, the allegedly disputed facts cited by Chuttoo are either blatantly contradicted by the videos, *see Scott*, 550 U.S. at 380–81, or not capable of affecting the outcome of this suit and are therefore not material questions of fact capable of defeating summary judgment, *see Anderson*, 477 U.S. at 248. As the videos clearly show, Chuttoo disobeyed several of the officers' commands and used physical force to resist their efforts to detain and handcuff at him. *See supra* Part III(A)(ii)(a)(1). Although probable cause may not have existed at the outset, facts developed during the encounter that would lead a reasonable person in the officers' shoes to believe that Chuttoo had resisted or was resisting arrest. Thus, viewing the evidence in the light most favorable to Chuttoo, no reasonable jury could conclude that the officers lacked probable cause to arrest him for resisting arrest.

But even if Horton and Andrade were mistaken that probable cause existed, Chuttoo has not shown that the absence of probable cause would have been apparent to any reasonable officer in Horton's or Andrade's respective positions. *See Roy*, 950 F.3d at 255. Chuttoo does not point to any case—much less any binding precedent or a robust consensus of persuasive authority—establishing the absence of probable cause for his arrest. *See id.* at 254–56 (granting qualified immunity on First Amendment retaliation claim because the plaintiff relied on inapposite precedent and failed to identify a robust consensus of persuasive authority). In other words, Chuttoo has failed to meet his burden to establish "beyond debate" that the officers' conduct was unlawful. *al-Kidd*, 563 U.S. at 741.

At bottom, there is no genuine issue of material fact that Horton and Andrade had probable cause, or at least arguable probable cause, to arrest Chuttoo. Because that conclusion defeats a First Amendment retaliatory arrest claim, *Nieves*, 139 S.Ct. at 1726, Chuttoo cannot overcome the officers' assertion of qualified immunity.

## B. The City's Motion for Judgment on the Pleadings

The Court next considers whether Chuttoo has stated a plausible Section 1983 claim against the City for violating his constitutional rights.[13]

---

[13] As explained above, the Court is treating the City's motion as one for dismissal under Federal Rule of Civil Procedure 12(c). Thus, for purposes of resolving the City's motion, the Court has excluded from consideration all matters outside the pleadings that the parties submitted in connection with the motions at issue. *See* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Because the Court excludes Horton's and Andrade's TCOLE records from consideration, it will not address the City's argument that compliance with state-mandated training requirements dooms Chuttoo's failure-to-train claim.

A municipality is a "person" subject to Section 1983 liability for violating an individual's constitutional rights. *Monell v. Dep't of Soc. Servs.* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But it is "well established that a city is not liable under § 1983 on the theory of respondeat superior," *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010), and is "almost never liable for an isolated unconstitutional act on the part of an employee," *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Rather, a municipality can be held liable only when the deprivation of a federally protected right is "directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Municipal liability requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle*, 613 F.3d at 541–42 (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

Chuttoo does not plausibly allege that the City had an official policy of Frisco police officers using excessive force or making retaliatory arrests. *See Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (explaining that a plaintiff's allegations about the policy or custom cannot be conclusory; they must contain specific facts showing the existence of such policy or custom). To the extent Chuttoo argues that Andrade's alleged supervision or training of Horton during the encounter at issue constituted official City policy, he is mistaken. It is true that a policy may be shown through a single incident, "but only if the person making the

decision had final policy-making power." *Quinn v. Guerrero*, 863 F.3d 353, 365 (5th Cir. 2017).

A final policymaker is "one who takes the place of the governing body in a designated area of city administration." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam). The Fifth Circuit has long distinguished between final decisionmaking authority and final policymaking authority: "discretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Bolton v. City of Dallas*, 541 F.3d 545, 548–49 (5th Cir. 2008) (per curiam) (citations omitted); *see also Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1246 (5th Cir. 1993) ("In *Pembaur* and *Praprotnik* the [Supreme] Court carefully distinguished between those having mere *decisionmaking* authority and those having *policymaking* authority."). Chuttoo does not plausibly allege that, at any point in time, Andrade had final policymaking authority for the City. So even if Andrade decided to show Horton how Frisco "police should behave" during their encounter with Chuttoo, (Dkt. #1 ¶ 8), that decision did not constitute an official policy of the City.

Nor does Chuttoo point to any specific, prior instances of Frisco police officers using excessive force or committing wrongful arrests that would indicate a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy. *See Piotrowski*, 237 F.3d at 579. Rather, Chuttoo alleges that his "constitutional rights were violated during and as part of future officer Horton's training provided by and under the auspices and supervision of the

City." (Dkt. #1 ¶ 30). In other words, Chuttoo claims that the City is liable for its failure to properly train Horton and Andrade.

A failure-to-train claim is a species of *Monell* liability. *Hutcheson v. Dallas County*, 994 F.3d 477, 482 (5th Cir. 2021). The "failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement." *Id.* (quotation omitted). To proceed beyond the pleading stage, a plaintiff must plausibly allege that "(1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Id.* (quotation omitted).

"Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," for which a "showing of simple or even heightened negligence will not suffice." *Valle*, 613 F.3d at 542, 547 (quotations omitted). To establish deliberate indifference, a plaintiff ordinarily must allege a "pattern of similar constitutional violations by untrained employees." *Hutcheson*, 994 F.3d at 482 (quotation omitted). But where such a pattern does not exist, it is still possible for a plaintiff to establish deliberate indifference through the single-incident exception. *Id.*

The single-incident exception is "extremely narrow" and requires the plaintiff to "prove that the highly predictable consequence of a failure to train would result in the specific injury suffered." *Id.* (quotation omitted). For a violation to be highly

predictable, the municipality "must have failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624–25 (5th Cir. 2018) (cleaned up). The single-incident exception "is generally reserved for those cases in which the government actor was provided no training whatsoever." *Hutcheson*, 994 F.3d at 483 (quotation omitted).

Chuttoo's claim against the City falls short. For starters, Chuttoo fails to establish the first element of a failure-to-train claim, which requires "identify[ing] specific deficiencies in the City's training procedures." *Quinn*, 863 F.3d at 365; *see also Hutcheson*, 994 F.3d at 482 ("In failure-to-train cases, defects in a particular training program must be specifically alleged." (cleaned up)). Chuttoo does not allege any specific facts that show what training Frisco police officers have received and how that training is insufficient. Instead, he alleges that Horton's status as a trainee, along with Andrade's allegedly unconstitutional conduct while acting as a supervisor, demonstrates that the City inadequately trained its officers. But an allegation that two officers—neither of which has final policymaking authority—allegedly committed some unconstitutional act cannot "alone suffice to fasten liability on the city, for the officer[s'] shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Contrary to Chuttoo's suggestion, the Court cannot infer from the single incident at issue that the City had a deficient training program. If the Court

concluded otherwise, it would result in the imposition of respondeat superior liability on the City—and it "is well established that a city is not liable under § 1983" based on that theory. *Valle*, 613 F.3d at 541. Because Chuttoo does not identify any specific deficiency in the City's training of its officers, as opposed to Horton's and Andrade's alleged misconduct, his allegations are insufficient to support a reasonable inference that the City failed to train its officers. Thus, Chuttoo cannot establish the first element of his failure-to-train claim.

Even if the allegations supported a plausible inference that the City failed to train the officers, Chuttoo's claim still would fail because he has not pleaded facts sufficient to establish the third element—deliberate indifference. Chuttoo does not allege a pattern of similar constitutional violations. *See Hutcheson*, 994 F.3d at 482. Nor can Chuttoo rely on the single-incident exception because he does not allege that the City provided "no training whatsoever" on how to use force or make arrests. *See id.* at 483 (quotation omitted). Indeed, the complaint repeatedly refers to Horton as "Trainee Horton" and states that the challenged conduct occurred while Horton "was still in field training." (Dkt. #1 ¶ 8). So the City provided at least some training to its officers. Because Chuttoo does not allege that the City provided no training on how to use force or make arrests, his allegations fail to meet the exacting standard for the narrow single-incident exception. Thus, Chuttoo's alleged facts do not permit the Court to draw the reasonable inference that the City was deliberately indifferent to an obvious need for training its officers. The Court therefore dismisses Chuttoo's failure-to-train claim.

### C. Chuttoo's Motion for Leave to Amend His Complaint

As a final matter, Chuttoo moves the Court to grant him leave to amend his complaint so that he may, on the same facts, assert a claim for declaratory relief: a declaration that Horton and Andrade violated his constitutional rights. (Dkt. #29, #30). "None of the factual allegations need change," says Chuttoo, "only the relief requested." (Dkt. #29 at 3). Chuttoo also requests leave to amend to "address any other deficiencies the Court may find in [his] original complaint." (Dkt. #29 at 1).

Because Chuttoo timely filed his motion for leave to amend, Federal Rule of Civil Procedure 15(a) supplies the applicable standard. Under Rule 15(a), a district court "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Although this mandate "significantly limits a district court's discretion, a district court still acts within its bounds when it denies leave because amendment would be futile." *Ariyan, Inc. v. Sewerage & Water Bd. of New Orleans*, 29 F.4th 226, 232 (5th Cir. 2022). In this context, futility means that "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000). So if the complaint, as amended, is subject to dismissal at the pleading stage, then amendment is futile. *Ariyan, Inc.*, 29 F.4th at 229. To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Waller*, 922 F.3d at 599 (quoting *Iqbal*, 556 U.S. at 678).

Here, Chuttoo argues that justice requires granting him leave to assert a claim for declaratory relief—despite his failure to overcome qualified immunity—so that the Court may determine whether Horton and Andrade violated his constitutional

rights. Not doing so, in Chuttoo's view, will leave "the law undeveloped in an area where undeveloped law is itself a defense." (Dkt. #34 at 2). Chuttoo contends that his proposed claim for declaratory relief offers a solution to this "catch-22" because it will allow the Court to determine whether a constitutional violation occurred even though qualified immunity bars his damages claims against Horton and Andrade. (Dkt. #34 at 2).

Chuttoo is not alone in his criticism of qualified immunity's clearly-established-law prong. To the contrary, "[e]ven in this hyperpartisan age, there is a growing, cross-ideological chorus of jurists and scholars urging recalibration of contemporary immunity jurisprudence. *Zadeh v. Robinson*, 928 F.3d 457, 480 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part) (footnotes omitted). But Chuttoo's point about the need for doctrinal reform is ultimately irrelevant to his request for leave to amend his complaint because, as Defendants point out, he lacks standing to seek declaratory relief.

"In a case of actual controversy within its jurisdiction," the Declaratory Judgment Act permits a federal court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). But the Act "does not vest the federal courts with jurisdiction broader than Article III's case or controversy limitation." *Waller*, 922 F.3d at 603 (quotation omitted). To show "a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future."

*Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003). In other words, to "obtain declaratory relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future." *Waller*, 922 F.3d at 603 (cleaned up); *see also Hall v. Smith*, 497 F.App'x 366, 374 (5th Cir. 2012) (per curiam) (affirming district court's decision to dismiss the plaintiff's claims for declaratory relief for lack of standing because she "failed to allege facts that demonstrate any likelihood that she will suffer injury in the future that the declaratory relief she seeks would redress").

In his proposed amended complaint, Chuttoo alleges only past injury to himself. He fails to allege facts that show any likelihood—let alone a substantial likelihood—that he will suffer injury in the future that the declaratory relief he seeks would redress. So Chuttoo would lack standing for the requested declaratory relief, and the Court would lack subject-matter jurisdiction to entertain it. Because Chuttoo's proposed claim for declaratory relief (along with all his other claims) would be subject to dismissal, amendment of his pleading would be futile. *Ariyan, Inc.*, 29 F.4th at 229.

Chuttoo also requests leave to "address any other deficiencies the Court may find in [his] original complaint," (Dkt. #29 at 1), but he does not offer any additional facts that he would, or could, add to do so. "This failure to specify how amendment would cure the fundamental deficiencies in [his] pleading" supports the conclusion that "amendment would be futile." *Ariyan, Inc.*, 29 F.4th at 229; *see also Legate v. Livingston*, 822 F.3d 207, 212 (5th Cir. 2016) (affirming denial of leave to amend

complaint as futile because the plaintiff "never identified the individuals he [sought] to add and [did] not explain[ ] how adding these defendants would overcome the substantive flaws in his Eighth Amendment and substantive-due-process claims"). Because amendment would be futile, the Court will deny Chuttoo's motion for leave to amend his complaint.

## IV. CONCLUSION

For all the reasons the Court has given, Horton and Andrade's Motion for Judgment on the Pleadings, as converted to summary judgment, (Dkt. #21), and the City's Motion for Judgment on the Pleadings, (Dkt. #22), are **GRANTED**.

It is therefore **ORDERED** that all claims against Horton, Andrade, and the City are **DISMISSED**.

It is further **ORDERED** that Chuttoo's Motion for Leave to Amend Complaint, (Dkt. #29), is **DENIED**.

The Court will enter a final judgment by separate order.

**So ORDERED and SIGNED this 7th day of September, 2022.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE